## COMMONWEALTH *vs.* KENNETH WARE.

No. 07-P-1701.

Suffolk. October 10, 2008. - September 23, 2009.

Present: TRAINOR, KATZMANN, & VUONO, JJ.

*Firearms. Practice, Criminal,* Sentence. *Constitutional Law,* Search and seizure. *Search and Seizure,* Standing to object, Consensual entry by police, Protective sweep.

At the trial of indictments charging, inter alia, unlawful possession of a firearm while being an armed career criminal, the defendant's prior conviction in District Court of possession of cocaine with the intent to distribute could serve as a predicate offense triggering the enhanced penalty provisions of the armed career criminal statute, G. L. c. 269, § 10G, where the prior conviction under G. L. c. 94C, § 32A(*a*), qualified as a serious drug offense within the meaning of the armed career criminal statute, and where the prosecution of that predicate offense in the District Court did not change the fact that the punishment for that crime fell within the requirement of the armed career criminal statute. [222-225]

A Superior Court judge properly concluded that the criminal defendant had standing under art. 14 of the Massachusetts Declaration of Rights to challenge the search of the home of his codefendant, where the defendant had automatic standing to challenge based on the fact that the charges against him (receiving a firearm with the serial or identification number obliterated and unlawful possession of a firearm while being an armed career criminal) could be viewed as charging him with possession (actual or constructive) of the firearm located in the home of his codefendant, and therefore, the defendant did not have to demonstrate an independent expectation of privacy in the premises searched. [226-230]

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence of a firearm seized following a warrantless entry into his codefendant's home, where the codefendant's wife consented to the entry of police officers into the home, and where the record contained no evidence of any unequivocal protest or objection by the codefendant to the officers' entry [230-233]; moreover, the judge correctly concluded that the officers' protective sweep of the home following their entry and arrest of the defendant and codefendant was justifiable [233]; finally, even if the initial entry and protective sweep were unlawful, exclusion of the evidence was not required, given that the subsequent search warrant was properly obtained based on witnesses' statements and police corroboration made prior to the initial entry [233-234].

INDICTMENTS found and returned in the Superior Court Department on December 17, 2001.

A motion to dismiss and a pretrial motion to suppress evidence were heard by *Peter J. Lauriat,* J., and the cases were tried before *Barbara J. Rouse,* J.

*Elizabeth Caddick* for the defendant.

*Joseph M. Ditkoff,* Assistant District Attorney *(Jennifer J. Hickman,* Assistant District Attorney, with him) for the Commonwealth.

KATZMANN, J. In this case we address whether a District Court conviction of possession of cocaine with the intent to distribute is a predicate offense under the armed career criminal statute. We also consider issues arising from the denial of a motion to suppress evidence.

On December 17, 2001, Kenneth Ware was indicted on charges of assault and battery by means of a dangerous weapon (Count 1) (G. L. c. 265, § 15A); three counts of assault and battery (Counts 2, 3, 4) (G. L. c. 265, § 13A); threats to commit a crime (Count 5) (G. L. c. 275, § 2); receiving a firearm with the serial or identification number obliterated (Count 6) (G. L. c. 269, § 11C); and unlawful possession of a firearm while being an armed career criminal based on three predicate offenses (Count 7) (G. L. c. 269, § 10[a]). His uncle, Eddie Ware (codefendant), was indicted on the same charges (as well as three others). The indictments arose from an incident that occurred in the Dorchester section of Boston on the evening of October 12, 2001.

On January 15, 2003, the defendant filed a motion to suppress and a motion to dismiss a portion of the armed career criminal indictment. On August 1, 2003, after an evidentiary hearing, a Superior Court judge denied the motion to suppress, issuing written findings.

The defendant and the codefendant were tried before a Superior Court jury from February 25, 2004, to March 2, 2004. A motion for a directed verdict was allowed as to Count 6. Following the close of all evidence, the defendant was acquitted of the charge of threats, and convicted of three counts of assault and battery and one count of unlawful possession of a firearm. After the jury trial, the defendant had a jury-waived trial on the issue whether he was an armed career criminal. The judge found the defendant

guilty and sentenced him to from ten to eleven years imprisonment on Count 7. The assault and battery convictions were placed on file with the defendant's consent.

The defendant now appeals,[1] contending that the judge erred in not dismissing the armed career criminal count, and in denying his motion to suppress. We affirm.

1. *Armed career criminal conviction.* The armed career criminal statute, G. L. c. 269, § 10G(*a*), provides enhanced penalties for an individual who unlawfully possesses a firearm or ammunition after "having been previously convicted of a violent crime or of a serious drug offense, both as defined" in § 10G itself. The sentences increase according to the number of predicate offenses, up to a maximum of three. G. L. c. 269, § 10G(*a*)-(*c*). The defendant contends that the enhanced penalty provision of G. L. c. 269, § 10G, is not triggered by his prior conviction under G. L. c. 94C, § 32A(*a*).[2]

General Laws c. 269, § 10G(*e*), defines "serious drug offense" as:

> "an offense under the federal Controlled Substances Act, 21 U.S.C. 801, et seq., the federal Controlled Substances Import and Export Act, 21 U.S.C. 951, et seq. or the federal Maritime Drug Law Enforcement Act, 46 U.S.C. App. 1901, et seq. for which a maximum term of imprisonment for ten years or more is prescribed by law, or an offense under chapter 94C involving the manufacture, distribution or possession with intent to manufacture or distribute a controlled substance, as defined in section 1 of said chapter 94C, for which a maximum term of *ten years or more* is prescribed by law"(emphasis added).

---

[1] The codefendant, who was also convicted by the jury on various counts, did not appeal.

[2] General Laws c. 94C, § 32A(*a*), as amended by St. 1982, c. 650, § 4, provides:

> "Any person who knowingly or intentionally manufactures, distributes, dispenses, or possesses with intent to manufacture, distribute or dispense a controlled substance in Class B of section thirty-one shall be punished by imprisonment in the state prison for not more than ten years, or in a jail or house of correction for not more than two and one-half years, or by a fine of not less than one thousand nor more than ten thousand dollars, or both such fine and imprisonment."

To support the § 10G enhancement, the Commonwealth relies on the defendant's previous District Court conviction of possession of a Class B substance with intent to distribute.[3] The defendant argues that his District Court conviction of this crime could not be a predicate drug offense because the maximum term that he faced in District Court was two and one-half years, and not the ten years required by statute for a serious drug offense.

Instructive is *Commonwealth* v. *Smith*, 444 Mass. 497, 497 (2005), where the Supreme Judicial Court addressed whether the reference in the deoxyribonucleic acid (DNA) sample statute to "an offense that is punishable by imprisonment in the [S]tate prison," G. L. c. 22E, § 3, included District Court convictions. In *Smith*, the defendant argued that because he was tried in District Court, he did not meet the statutory criterion of being convicted of an offense that carried the possibility of a State prison sentence. *Ibid.* The court rejected the defendant's argument, reasoning that "the issue is how the 'crime' itself may potentially be punished, not how a particular defendant before a particular court may be punished." *Id.* at 497-498, 500 n.1. Accordingly, the court held that the statute extends to the defendant because his offense was punishable by a State prison sentence. *Id.* at 500-501.

We also note that G. L. c. 269, § 10G(*a*) & (*e*), largely replicates 18 U.S.C. § 924(e) & (e)(2)(A)(ii), the Federal Armed Career Criminal Act (ACCA). We find instructive that in interpreting that statute, the United States Court of Appeals for the First Circuit, when faced with the precise issue now before us, determined that a Massachusetts State District Court drug conviction is a "serious drug offense" under the statute. *United States* v. *Moore*, 286 F.3d 47, 49-51 (1st Cir.), cert. denied, 537 U.S. 907 (2002) (prior conviction under Massachusetts statute for possessing cocaine with intent to distribute, for which statutory maximum possible penalty was ten years' imprisonment, qualified as "serious drug offense" under ACCA, and thus, could

---

[3]Ultimately, at sentencing, the defendant had two predicate offenses: a Superior Court conviction of armed assault with intent to murder and a District Court conviction of possession of a Class B substance, which is at issue here. The defendant does not contest that the former conviction qualifies as a "violent crime."

serve as predicate offense for sentence enhancement, even though court that adjudicated conviction could not, under State law, impose sentence of more than two and one-half years). See *United States* v. *Matthews*, 498 F.3d 25, 36 (1st Cir. 2007), cert. denied, 552 U.S. 1238 (2008) (declining to revisit *United States* v. *Moore, supra*); *United States* v. *Gunn*, 962 F. Supp. 214, 215-16 (D. Mass. 1997), aff'd, 141 F.3d 1150 (1st Cir.), cert. denied, 524 U.S. 932 (1998) (cited with approval in *United States* v. *Moore, supra* at 49) (defendant's three prior Massachusetts drug convictions were "serious drug offenses" under ACCA, even though defendant was prosecuted on those offenses in Massachusetts District Court and thus could have received maximum penalty of two and one-half years, where maximum penalty set forth in statute for those offenses was ten years in State prison). See also *United States* v. *Sousa*, 468 F.3d 42, 45 (1st Cir. 2006) (defendant's prior conviction for assault with dangerous weapon was felony, and thus was predicate offense under Federal law prohibiting felon from being in possession of firearm, despite fact that defendant was prosecuted in Municipal Court and could not have been sentenced to State prison, as required for crime to be considered felony; crime charged carried potential for State prison term of not more than five years).

In *United States* v. *Moore, supra,* the First Circuit Court of Appeals, in following a categorical approach, observed that in determining whether a prior conviction may serve as a predicate offense for sentence enhancement purposes (under the Federal ACCA), "the sentencing court typically must limit its inquiry to 'the fact of conviction and the statutory definition of the prior offense.' " *United States* v. *Moore*, 286 F.3d at 49, quoting from *Taylor* v. *United States*, 495 U.S. 575, 602 (1990). "[I]t makes no difference under the [ACCA] that the government elected to pursue [the defendant's] drug offenses in a Massachusetts District Court . . . . [T]he statutory language of [G. L. c.] 94C, § 32A establishes that [the defendant] *could have* received at least ten years in state prison." *United States* v. *Gunn*, 962 F. Supp. at 216. "[General Laws c.] 94C, § 32A(*a*), allows for a maximum possible penalty of ten years' incarceration, and, thus, fits comfortably within the ambit of 'serious drug offense' [under the ACCA]." *United States* v. *Moore, supra.*

We think that *Commonwealth* v. *Smith*, 444 Mass. at 497-500, and the Federal cases are persuasive to our analysis. Here, the defendant's prior conviction under G. L. c. 94C, § 32A(*a*), provides for punishment by imprisonment in the State prison for not more than ten years. Thus, it qualifies as a "serious drug offense" under G. L. c. 269, § 10G(*e*). The defendant's prosecution for the predicate offense in District Court does not change the fact that the punishment for this crime in the State prison still falls within G. L. c. 269, § 10G(*e*). We agree with the judge's determination that the defendant's G. L. c. 94C, § 32A(*a*), conviction triggers the enhanced penalty under G. L. 269, § 10G(*e*).

2. *Motion to suppress.* a. *The evidentiary hearing.* The judge conducted an evidentiary hearing on the motions to suppress filed by the defendant and the codefendant. At the hearing, Officer Robert Lyden, Detective William Doogan, and Detective Michael Devane of the Boston police department testified, as did Cordelia Ware, the wife of the codefendant. The judge found:

> "At about 10 P.M. on the evening of October 12, 2001, Boston Police Officer . . . Lyden . . . , while patrolling the Dorchester section with Sergeant Charles Burn and Officer Chris Carol, received a radio call for a man with a gun at 11-12 York Street in Dorchester, who had then fled toward Harlem Street. After a brief search in the area of Harlem Street, Lyden and the other officers went to York Street, where they interviewed several adults and juveniles. From these interviews the police learned that two juveniles had allegedly been assaulted by an individual named Kenny [the defendant] and another individual known as "the minister," whom they had identified as Eddie [the codefendant]. The witnesses told the officers that one of the two men had a long barreled, black colored handgun with a light brown handle, and that both men had fled inside 12 York Street prior to the arrival of the police."

The judge found that the officers then went to 12 York Street, and there spoke with the codefendant, who identified himself as the owner of the three-family house, and occupant of the first floor. The judge detailed various interactions that the officers had during the course of the evening at 12 York Street with the codefendant and his wife, Cordelia Ware. Ultimately, the offi-

cers arrested the defendant, who was sitting next to the codefend-
ant in the parlor. They conducted a protective sweep of the
basement area where they saw the codefendant's mother-in-law,
who told them that the codefendant had an office in the basement.
The officers then obtained a search warrant authorizing a search
of "apartment #1, the basement, the basement office, the base-
ment bedroom and all common areas of number 12 York Street,
Dorchester, Mass." When the warrant was executed, the officers
found the firearm at issue in this case, as well as drugs and
ammunition.[4]

b. *Issues.* When evaluating the denial of a motion to suppress
on appeal, we review findings of fact for clear error but
independently determine correctness of judge's application of
constitutional principles to facts as found. See *Commonwealth
v. Scott,* 440 Mass. 642, 646 (2004). The defendant contends
that the judge erred in denying his pretrial motion to suppress,
claiming that the initial entry by the police into the codefend-
ant's dwelling, leading to the issuance of the search warrant, as
well as the protective sweep, was unlawful. He also argues that
the search warrant does not pass muster. We first address the is-
sue of the defendant's standing to challenge the search.

(i) *Article 14 of the Massachusetts Declaration of Rights and
the defendant's standing.* The Commonwealth contends that the
judge erred in ruling that the defendant had standing under art.
14 of the Massachusetts Declaration of Rights to challenge the
search of the home owned by the codefendant, where the firearm
that is the subject of Counts 6 and 7 was retrieved. We note that
"in reviewing a judge's ruling on a motion to suppress, an ap-
pellate court 'may not rely on the facts as developed at trial'
even where the testimony differed materially from that given at
trial." *Commonwealth v. Grandison,* 433 Mass. 135, 137 (2001),
quoting from *Commonwealth v. Garcia,* 34 Mass. App. Ct. 386,
391-392 (1993). Thus, while the Commonwealth references the
trial record in its standing argument, we will not consider it in
our analysis, nor will we consider any arguments not presented
to the motion judge. The Commonwealth argued to the motion
judge that the defendant did not have standing because he did

[4]As relevant, in our discussion we will note other findings made by the
judge.

not live at 12 York Street and therefore did not have a reasonable expectation of privacy there, and that he was attempting to assert rights that belonged to the codefendant, the occupant of 12 York Street. The judge ruled that because the defendant was charged with offenses where possession is an element, he had automatic standing. We determine that the Commonwealth's arguments are unpersuasive. At the same time, while we agree with the judge's conclusion, our analysis proceeds on an additional track.

As a general matter, in order to trigger art. 14 analysis, the three necessary conditions that must be present are governmental action, standing, and expectation of privacy. See Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 3-2 (2009-2010 ed). However, in cases where there are codefendants and constructive possession triggers automatic standing, there is a limited exception to the requirement that each defendant have an expectation of privacy in the place searched. See *Commonwealth* v. *Frazier*, 410 Mass. 235, 243 (1991); *Commonwealth* v. *Alvarado*, 420 Mass. 542, 543 n.2 (1995). See also Grasso & McEvoy, *supra* at § 3-5(f).

We thus first look to determine whether the defendant has automatic standing. Massachusetts has adopted the automatic standing rule that was enunciated by the United States Supreme Court in *Jones* v. *United States*, 362 U.S. 257 (1960).[5] In *Commonwealth* v. *Amendola*, 406 Mass. 592, 601 (1990), the court stated that "[w]hen a defendant is charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt, the defendant shall be deemed to have standing to contest the legality of the search and the seizure of that evidence."[6] The dispositive issue in determining whether a defendant has automatic standing is whether "pos-

[5]The automatic standing rule in *Jones* v. *United States*, 362 U.S. 257 (1960), was abandoned twenty years later in *United States* v. *Salvucci*, 448 U.S. 83 (1980).

[6]In its argument on appeal with respect to automatic standing, the Commonwealth relies primarily on *Commonwealth* v. *Mora*, 402 Mass. 262 (1988), which is a pre-*Amendola* case. However, while *Mora* generally dealt with the issue of standing, it did not address directly the viability of the automatic standing rule in Massachusetts. See *Commonwealth* v. *Amendola*, *supra* at 599. The post-*Amendola* cases, directly addressing automatic standing, bear more relevance to the present case.

session of the seized evidence at the time of the contested search is an essential element of guilt." See *ibid.*; *Jones* v. *United States, supra* at 263-264. See also *Commonwealth* v. *Midi,* 46 Mass. App. Ct. 591, 593 (1999) (defendant had standing to contest search and seizure of firearm where possession of firearm was essential element of crime). See *Commonwealth* v. *Garcia,* 34 Mass. App. Ct. 386, 390-391 (1993) (declining to grant standing where charges against defendant alleged distribution of narcotics, and not possession).

"Whether a defendant has standing under *Amendola* depends on allegations made by the Commonwealth, not on whether the defendant had a legitimate expectation of privacy in the area searched."[7] *Commonwealth* v. *Frazier,* 410 Mass. at 244 n.3. Here, the Commonwealth charged the defendant and codefendant with receiving a firearm with the serial or identification number obliterated (Count 6) (G. L. c. 269, § 11C), and unlawful possession of a firearm while being an armed career criminal based on the predicate offenses (Count 7) (G. L. c. 269, § 10[*a*]). Both crimes, as charged, include an element of possession.[8]

---

[7]Massachusetts courts apply the "reasonable expectation of privacy" test in analyzing searches under the Fourth Amendment to the United States Constitution. *Commonwealth* v. *Frazier,* 410 Mass. at 244 n.3. See *Commonwealth* v. *Panetti,* 406 Mass. 230, 231 (1989); *Commonwealth* v. *Pina,* 406 Mass. 540, 544-545, cert. denied, 498 U.S. 832 (1990). "In cases where possession is an essential element of the crime we think it is best to separate the issue of standing from the question whether there has been a search for constitutional purposes." *Commonwealth* v. *Frazier, supra.*

[8]General Laws c. 269, § 11C, as amended through St. 1996, c. 151, c. 492, provides, in relevant part:

> "Whoever . . . removes, defaces, alters, obliterates or mutilates in any manner the serial number or identification number of a firearm, or in any way participates therein, and whoever *receives* a firearm with knowledge that its serial number or identification number has been removed, defaced, altered, obliterated or mutilated in any manner, shall be punished . . . . *Possession or control* of a firearm the serial number or identification number of which has been removed, defaced, altered, obliterated or mutilated in any manner shall be prima facie *evidence* that the person having such possession or control is guilty of a violation of this section . . . ." (Emphasis added.)

General Laws c. 269, § 10(*a*), as amended through St. 1990, c. 511, § 2, provides, in relevant part:

> "Whoever, except as provided or exempted by statute, knowingly has in his *possession*; or knowingly has under his *control* in a vehicle; a

"Possession implies 'control and power,' . . . exclusive or joint . . . , or, in the case of 'constructive possession,' knowledge coupled with the ability and intention to exercise dominion and control." *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409 (1989), quoting from *Commonwealth* v. *Rosa*, 17 Mass. App. Ct. 495, 498 (1984). See *Commonwealth* v. *Moore*, 54 Mass. App. Ct. 334, 342-343 (2002) (unlawful possession under G. L. c. 269, § 10[a], and G. L. c. 269, § 11C, can be actual or constructive). "The fact that a defendant did not have actual possession of the seized item at the time of the search, or that he was not present at the place where the search was conducted, does not preclude in every instance the defendant from having standing to challenge the legality of the search." *Commonwealth* v. *Frazier*, 410 Mass. at 243 (defendant had standing to contest search where he was convicted of trafficking based upon cocaine seized from handbag of woman with whom he was acting in concert, although he was not present at place where search was conducted). See *Commonwealth* v. *Santaliz*, 413 Mass. 238, 240 n.5 (1992); *Commonwealth* v. *Alvarado*, 420 Mass. at 543 n.2; *Commonwealth* v. *Carter*, 424 Mass. 409, 410-411 (1997).

Because the charges against the defendant can be viewed as charging him with possession (constructive or actual) of the firearm (located in the home of his codefendant), he has automatic standing to challenge the search of that home.[9] Because the "defendant and his confederate [the codefendant] are treated, in effect, as one for the purpose of deciding whether there was a

firearm, loaded or unloaded, as defined in section one hundred and twenty-one of chapter one hundred and forty without either: (1) being present in or on his residence or place of business; or (2) having in effect a license to carry firearms issued under section one hundred and thirty one of chapter one hundred and forty . . . shall be punished . . . ." (Emphasis added.)

[9]Indeed, at the suppression hearing, Detective Doogan testified that children at the incident told him that the defendant had said to the codefendant, "Go get the joint." The codefendant went back to the dwelling at 12 York Street, and then returned, and "handed something to [the defendant], . . . [who] then came back across the street, this time with the firearm, the handgun stuck in his waistband. That's when the threatening with the firearm started. . . . [A]t some point [the defendant and the codefendant] both went back across the street and into number twelve." Officer Lyden similarly testified that witnesses had told him that the codefendant had retrieved a gun from 12 York Street and had "handed [it] off" to the defendant."

reasonable expectation of privacy," he is relieved of the further requirement that he demonstrate an independent "expectation of privacy in the [premises] searched." *Id.* at 411. See *Commonwealth* v. *Herring*, 66 Mass. App. Ct. 360, 363-364 (2006). Accordingly, the motion judge was correct in ruling that the defendant could contest the search and seizure of the property at issue. Accord *Commonwealth* v. *Frazier, supra*; *Commonwealth* v. *Amendola*, 406 Mass. at 601.

(ii) *Legality of the warrantless entry into the home.* The defendant asserts that the initial warrantless entry by the police into the residence of the codefendant was unlawful, contending that there was no valid consent to the entry.

Warrantless entry is justified where voluntary consent is obtained from the owner or resident of the house. See *Commonwealth* v. *Walker*, 370 Mass. 548, 553-554, cert. denied, 429 U.S. 943 (1976); *Commonwealth* v. *Ortiz*, 422 Mass. 64, 70 (1996); *Commonwealth* v. *Sanna*, 424 Mass. 92, 97-98 (1997) (defendant's father, who was owner of house and present at time of police entry, gave valid consent). See Smith, Criminal Practice and Procedure § 4.112 (3d ed. 2007).

The burden of proving consent rests with the Commonwealth. *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496 (1976). The Commonwealth must establish by a preponderance of the evidence that the party reportedly giving consent did so "unfettered by coercion, express or implied," and did something "more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Walker, supra* at 555, quoting from *Bumper* v. *North Carolina*, 391 U.S. 543, 549 (1968). The voluntariness of an individual's consent to a warrantless entry is an issue of fact, and must be examined in light of the circumstances of each case. See *Commonwealth* v. *Aguiar, supra*; *Commonwealth* v. *Rogers*, 444 Mass. 234, 238 (2005).

In the present case, the record shows conflicting testimony on the issue of consent to enter the codefendant's residence. First is the question of the consent of Cordelia Ware, the wife of the codefendant and also a resident at 12 York Street.[10] She testified

---

[10]The judge found: "While the officers were waiting for the arrival of detectives who had been called to the scene to assist in the investigation, . . . Cordelia Ware . . . arrived at 12 York Street. When the officers told her of

that when she opened the door for a second time, she could not shut it because the police officer's foot was in the door; therefore, she left the house without closing the door, thus letting the officers come inside the apartment. The defendant contends that Cordelia Ware's testimony shows that she did not consent to the police's entry into the residence. To the contrary, however, the police officers testified that she allowed the entry.

The motion judge made a determination — after hearing the testimony of all witnesses — that Cordelia consented to the initial entry by the police into the residence. Reviewing the record, we discern no clear error and accept this determination, especially in light of the applicable standard that "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses, and not this court." *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), quoting from *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). Moreover, "[t]he clear error standard is a very limited form of review," and when presented with conflicting evidence, "a judge's resolution of such conflicting testimony invariably will be accepted." *Commonwealth* v. *Yesilciman, supra*, quoting from *Commonwealth* v. *Spagnolo*, 17 Mass. App. Ct. 516, 517-518 (1984).

The defendant asserts that Cordelia's consent to entry was not sufficient to pass constitutional muster under *Georgia* v. *Randolph*, 547 U.S. 103 (2006). The *Randolph* decision involved a husband who clearly objected, and his wife who consented, to a search of the marital residence by police officers. *Id.* at 107. The United States Supreme Court held that the wife's consent was not sufficient for a reasonable search, and that the wife, as a cotenant, could not waive the objector's constitutional rights if a potential defendant is at the door and objects to the search. The Court stated:

> "[W]e have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does

the alleged assault on the juveniles, she opened the door to the first floor apartment, entered and shut the door, reopened it and allowed the officers to enter the apartment. Upon entering, the officers observed [the codefendant] and another male [the defendant] seated in the parlor."

not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out."

*Id.* at 121.

The defendant here, as did the defendant in *Commonwealth* v. *Ocasio*, 71 Mass. App. Ct. 304, cert. denied, 129 S. Ct. 314 (2008), "seeks to portray himself as falling on the protected side of the 'fine line' drawn by the Supreme Court [in the *Georgia* v. *Randolph* decision]." *Id.* at 308, quoting from *Georgia* v. *Randolph, supra* at 121. The defendant argues that the codefendant's refusal of consent to entry was obvious from the facts that he knew that police desired to enter the apartment; that (as the judge found) he closed the door; and that he did not respond to the police's continuous knocking and inquiries. However, as in *Ocasio*, the record here contains no evidence of any unequivocal protest or objection by the codefendant.[11] Here, the judge determined that initially, when the police officers went to 12 York Street and spoke with the codefendant, he "invited them into the hallway and the parlor of his first floor apartment, [although] he did not allow a search to be conducted." When the police returned to the codefendant's apartment (after having gone to the defendant's second-floor apartment upon following up on the codefendant's information), the codefendant "had closed his apartment door and would not answer their knocks." When, shortly thereafter, Cordelia Ware "allowed the officers to enter the apartment," they saw the codefendant and the defendant "seated in the parlor." There is nothing in the record to indicate that the codefendant communicated to the police any objection or protest to their entry at that point.[12] The codefendant's refusal cannot be derived from his silence; to counteract his wife's consent, the codefendant would have had to express his refusal affirmatively and unequi-

---

[11]In *Ocasio*, the defendant's mother consented to the search of the defendant's apartment while the defendant stood arrested and handcuffed in the hallway. *Commonwealth* v. *Ocasio, supra* at 306. As the record contained no unambiguous objection by the defendant, this court, contrasting with the *Randolph* decision, held that the defendant's mother's consent was valid. *Id.* at 308-309.

[12]Cordelia Ware testified that she could not "recall" whether the codefendant told the police officers to get out of the house. She also testified that she did not ask the officer to leave.

vocally. See *Commonwealth* v. *Ocasio, supra* at 309, quoting from *Georgia* v. *Randolph, supra* at 121 (rejecting an "approach [that] would extend the holding in *Georgia* v. *Randolph* to require active participation by a potential defendant to legitimize the consent granted by a cotenant, an extension directly contradicted by the 'fine line' " drawn by Supreme Court). Therefore, we agree with the determination of the motion judge that the police's initial entry into the codefendant's apartment, with the valid consent by Cordelia Ware, was lawful.

(iii) *Miscellaneous claims.* The other suppression issues raised by the defendant are not meritorious. The protective sweep was justifiable. Here, when the police arrested the defendant in 12 York Street, they had not located the firearm allegedly used by him. Therefore, it was reasonable for the police to conduct a protective sweep following the defendant's arrest to insure their own safety by ascertaining that there were no other individuals at the dwelling who could potentially pose danger. Subsequent to an arrest, a protective sweep of a dwelling is valid "in the interest of insuring the safety of the police." *Commonwealth* v. *Bowden*, 379 Mass. 472, 478 (1980). See *Commonwealth* v. *Acosta*, 416 Mass. 279, 283 (1993). Accord *Maryland* v. *Buie*, 494 U.S. 325, 327, 335 (1990).[13] See Smith, Criminal Practice and Procedure, *supra* at § 4.99.

Finally, even if the initial entry and protective sweep were unlawful, the exclusion of the evidence was not required as long as the subsequent search warrant was properly obtained. *Commonwealth* v. *DeJesus*, 439 Mass. 616, 624-625 (2003). Here, the affidavit, on the basis of which the warrant was issued, established probable cause with adequate specificity. *Commonwealth* v. *Donahue*, 430 Mass. 710, 711-712 (2000). The affidavit was based on the statements of the witnesses who observed the defendant carrying the gun and subsequently entering the codefendant's residence at 12 York Street. Additionally, the police corroborated the witnesses' statements by speaking to the codefend-

---

[13]Furthermore, the "freezing" of the house — which took place prior to the protective sweep — was proper. Securing or "freezing" a dwelling while waiting for a search warrant is not unreasonable. See *Commonwealth* v. *Yesilciman*, 406 Mass. at 743. The only limitation on the police is that they do not begin a search of the premises until the warrant arrives. *Ibid.*

ant — prior to the allegedly improper initial entry and sweep — about the defendant's whereabouts.[14] Therefore, the motion judge made a proper determination that "based upon police corroboration and the witnesses' statements, there was sufficient probable cause to obtain a search warrant." See *Commonwealth* v. *Russell,* 46 Mass. App. Ct. 513, 517 (1999).

*Judgment affirmed.*

---

[14]The codefendant identified the gunman as the defendant and stated that he had run upstairs and out the rear. The police officers, finding the rear doors locked, concluded that it was unlikely that the fleeing defendant had just used them.